IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

ANTHONY HAMMOND MURPHY and
BLAIR DOUGLASS,

                              Plaintiffs,

        v.

CHARLES TYRWHITT, INC.,

                              Defendant.

Civil Action No. 1:20-cv-00056-SPB-RAL

**AMENDED NATIONWIDE CLASS ACTION COMPLAINT**

COME NOW Plaintiffs Anthony Hammond Murphy and Blair Douglass (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated and allege upon personal knowledge as to themselves and upon information and belief as to all other matters, as follows:

**NATURE AND SUMMARY OF THE ACTION**

1.      This action arises from the failure of Defendant Charles Tyrwhitt, Inc. ("Charles Tyrwhitt" or "Defendant") to make its digital properties accessible to blind individuals,[1] which violates the effective communication and equal access requirements of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181-12189. These provisions were enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against

---

[1]      For semantic convenience, Plaintiffs use the term "blind" in its broadest sense to include all persons who, under federal civil rights laws, have a vision-related disability that requires alternative methods to access digital information.

individuals with disabilities"[2] by "assur[ing] equality of opportunity, full participation, independent living, and economic self-sufficiency."[3]

2.      The injunctive relief that Plaintiffs seeks will inure to the benefit of an estimated 2.3 percent of the United States population who report being blind,[4] and to Defendant, who will extend its market reach to this population.[5]

3.      For this significant portion of Americans, accessing websites, mobile applications, and other information has become a necessity, not a convenience.

4.      The growth of usage is rivaled only by the myriad ways in which users can harness the capabilities of the internet for the betterment of their lives through education, employment, entertainment, commerce, and countless other pursuits.

5.      The U.S. Chamber of Commerce has documented consumers' increasing reliance on the internet to shop online:

> The average consumer spends more than $1,700 per year on online shopping, a number that's continuing to rise. The convenience, affordability and ability to compare prices with ease has led more and more customers to visit e-commerce sites before heading to a brick-and-mortar location.[6]

---

[2]     42 U.S.C. § 12101(b)(1).

[3]     42 U.S.C. § 12101(a)(7).

[4]     Erickson, W., Lee, C., von Schrader, S., Disability Statistics from the American Community Survey (ACS). Ithaca, NY: Cornell University Yang-Tan Institute (YTI), available at www.disabilitystatistics.org (last visited July 20, 2020).

[5]     Sharron Rush, W3C Web Accessibility Initiative, *The Business Case for Digital Accessibility* (Nov. 9, 2018), available at https://www.w3.org/WAI/business-case/ (last visited July 20, 2020) ("The global market of people with disabilities is over 1 billion people with a spending power of more than $6 trillion. Accessibility often improves the online experience for all users.").

[6]     Emily Heaslip, U.S. Chamber of Commerce, *A Guide to Building an Online Store* (Sept. 20, 2019), available at https://www.uschamber.com/co/start/startup/how-to-build-online-stores (last visited July 20, 2020).

New research by Leanplum found that 95% of consumers will buy at least half of their gifts online. Shoppers, especially millennials and Gen Zers, favor the convenience and the great offers and discounts associated more with shopping online than visiting a brick-and-mortar location. It's these groups that are driving e-commerce retailers to be strategic with their website design. The Leanplum survey found that 80% of respondents shop on their mobile devices.[7]

6.      But "[a]s technology continues to evolve at a rapid pace, it is important to consider factors that can facilitate or impede technology adoption and use by people with disabilities."[8]

7.      This is especially true with respect to accessing the internet, where people with disabilities stand to benefit immensely if online services were fully and equally accessible to them. The National Federation of the Blind explains:

> In many ways, individuals with disabilities rely on Web content more so than their nondisabled peers because of inherent transportation, communication, and other barriers. A blind person does not have the same autonomy to drive to a covered entity's office as a sighted person. A deaf or hard of hearing person does not have the same opportunity to call a covered entity's office. A person with an intellectual disability does not have the same ability to interact independently with the staff at a covered entity's office. The 24-hour-a-day availability of information and transactions on covered entity websites and mobile apps provides a level of independence and convenience that cannot be replicated through any other means. That is why the number of Americans who rely on the Internet has increased year after year and why entities offer information and transactions through that unique medium.[9]

---

[7]      Emily Heaslip, U.S. Chamber of Commerce, *5 Ways to Optimize Your E-Commerce Site for Mobile Shopping* (Jan. 6, 2020), available at https://www.uschamber.com/co/run/technology/building-mobile-friendly-ecommerce-websites (last visited July 20, 2020). According to one report, e-commerce is growing 23% each year[.] Emily Heaslip, U.S. Chamber of Commerce, *The Complete Guide to Selling Online* (Jan. 28, 2020), available at https://www.uschamber.com/co/run/technology/small-business-ecommerce-guide (last visited July 20, 2020).

[8]      National Council on Disability, *National Disability Policy: A Progress Report* (Oct. 7, 2016), available at https://ncd.gov/sites/default/files/NCD_ProgressReport_ES_508.pdf (last visited July 20, 2020).

[9]      Comment from disability rights organizations to DOJ Supplemental Advance Notice of Proposed Rulemaking "Nondiscrimination on the Basis of Disability; Accessibility of Web

8.      When digital content is properly formatted, it is universally accessible to sighted and blind people alike. When it's not, blind individuals are required to expend additional time and effort to overcome obstacles not applicable to sighted users, which may require the assistance of third parties or, in some instances, may deny outright access to the online service.[10]

9.      Unfortunately, Defendant's digital properties are not properly formatted, and as such, deprives people who are blind from accessing information about Defendant's products and using its online services, all of which is otherwise made easily available to sighted persons.

10.     This action seeks to remedy that discrimination and inequality.

## JURISDICTION AND VENUE

11.     The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

12.     Defendant attempts to, and indeed does, participate in the Commonwealth's economic life by offering and providing products and services over the internet to Pennsylvania residents, including Plaintiffs. Unlike, for example, a winery that may not be able sell and ship wine to consumers in certain states, Defendant purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-

---

Information and Services of State and Local Government Entities," C RT Docket No 128, RIN 119 -AA65, available at https://nfb.org/ada-title-iiiinternet-regulations-joint-sanprm-comments (last visited July 20, 2020), Answer 57 (October 7, 2016) (citations omitted).

[10]    These factors often lead disabled individuals to abandon the process of purchasing items online after they begin. Kasey Wehrum, Inc., *Your Website is Scaring Customers Away. 5 Easy Ways to Fix It* (Jan. 2014), available at https://www.inc.com/magazine/201312/kasey-wehrum/how-to-get-online-customers-to-complete-purchase.html (last visited July 20, 2020) (documenting the most common causes of shopping cart abandonment, including: "Your Checkout button is hard to find[,]" "Shoppers question the safety of their personal info[,]" and "Getting through the checkout process takes multiple clicks.").

days a year to Pennsylvania residents.[11] These online sales contracts between Defendant and Pennsylvania residents involve, and indeed require, Defendant's knowing and repeated transmission of computer files over the internet in Pennsylvania.

13.     Plaintiffs were injured when they attempted to access the Website from this District, but encountered barriers that denied them full and equal access to Defendant's online goods, content, and services.

14.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Plaintiffs' claims occurred.

## **PARTIES**

15.     Murphy is a natural person over the age of 18. He resides in and is a citizen of Erie, Pennsylvania, located in Erie County.

16.     He graduated from Edinboro University with a degree in sociology in 1999 and today he works for the Commonwealth of Pennsylvania.

17.     Douglass is a natural person over the age of 18. He resides in and is a citizen of Pittsburgh, Pennsylvania, located in Allegheny County.

---

[11]     *See Gniewkowski v. Lettuce Entertain You Enterprises*, Case No. 2:16-cv-1898-AJS, Order, ECF 123 (W.D. Pa Apr. 25, 2017) *clarified by Order of Court*, ECF 169 (W.D. Pa. June 22, 2017) (Judge Schwab) (*citing Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119 (W.D. Pa. 1997) (exercising specific personal jurisdiction over forum plaintiff's website accessibility claims against out-of-forum hotel operator); *Law School Admission Council, Inc. v. Tatro*, 153 F.Supp.3d 714, 720-21 (E.D. Pa. 2015) (exercising personal jurisdiction over out-of-forum website operator); *Access Now Inc. v. Otter Products, LLC*, 280 F.Supp.3d 287 (D. Mass. 2017) (exercising personal jurisdiction over forum plaintiff's website accessibility claims against out-of-forum website operator); *Access Now, Inc. v. Sportswear, Inc.*, 298 F.Supp.3d 296 (D. Mass. 2018) (same).

18.     He works for an area university as a Program Administrator, managing all phases of the admission process for a highly competitive science training program, among other things. Douglass is also a licensed Pennsylvania attorney. He graduated from the University of Pittsburgh School of Law. During his enrollment at Pitt Law, Douglass completed a judicial internship in the United States District Court for the Western District of Pennsylvania.

19.     Plaintiffs are and, at all times relevant hereto, have been legally blind and are therefore members of a protected class under the ADA, 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq*. As a result of their blindness, Plaintiffs rely on screen access software, including JAWS from Freedom Scientific and VoiceOver with iOS, to access digital content, like an email, a website, or an app.

20.     Plaintiffs Murphy[12] and Douglass[13] have advocated for blind individuals their entire lives and long before ever filing a lawsuit.

---

[12]     *How did Erie plow crews do?: Your view from Facebook*, GoErie.com (Jan. 7, 2018), https://www.goerie.com/opinion/20180107/how-did-erie-plow-crews-do-your-view-from-facebook ("Anthony Hammond Murphy: As a visually impaired person, I find it very difficult to cross streets via curb cuts due to the snow and ice being plowed into these corners. The plow drivers should be allowed to triangulate and get the corners as well, and not just go north-south and east-west.") (last accessed July 20, 2020).

[13]     Treshea N. Wade, *Blindness doesn't keep teen from success*, Trib Total Media, LLC (May 30, 2005), available at https://archive.triblive.com/news/blindness-doesnt-keep-teen-from-success/ (last visited July 20, 2020) ("I am not striving necessarily for perfection, but I just want to do well[.] …Sure I have a disability. But it's a disability that anyone can readily overcome with a lot of hard work."); Zak Koeske, *Pitt student aims to rise above stereotype*, Pittsburgh Post-Gazette (July 23, 2009), available at https://www.post-gazette.com/local/south/2009/07/23/Pitt-student-aims-to-rise-above-stereotype/stories/200907230364 (last visited July 20, 2020) ("Blindness can't hold you back from doing anything you want to do[.] …Blindness is simply a physical condition. You have to make a few adaptations, but those aren't big enough to affect your ability to do a job competently. …There are always going to be some people who doubt your ability. ... I have no trouble trying to prove them wrong.").

21.     Defendant is a Delaware corporation with a principle place of business at 360 Lexington Avenue, 24th Floor, New York, NY 10017.

22.     Defendant sells premium dress shirts direct to consumers.

23.     In order to access and purchase the products and services that Defendant offers, Plaintiffs may visit Defendant's website at https://www.ctshirts.com/us (the "Website").

24.     Defendant owns, operates, and/or controls its Website and is responsible for the policies, practices, and procedures concerning the Website's development and maintenance.[14]

## STANDING UP FOR TITLE III OF THE ADA

25.     "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination."[15] "It was called the '20th Century Emancipation Proclamation for all persons with disabilities.'"[16] "Title III of the ADA contained broad language covering numerous public accommodations; both new construction and existing facilities were required by the statute to remove barriers to access. The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the

---

[14]     *See* General terms and conditions, available at https://www.ctshirts.com/us/terms-and-conditions/ (last visited July 20, 2020).

[15]     Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), available at http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (last visited July 20, 2020) (*citing* H.R. REP. No. 101-485, pt. 2, at 28-29 (1990)).

[16]     Kelly Johnson *supra* note 15, at 684 (*quoting* Russell Hymas & Brett R. Parkinson, Comment, *Architectural Barriers Under the ADA: An Answer to the Judiciary's Struggle with Technical Non-Compliance*, 39 CAL. W. L. REV. 349, 350 (2003), available at https://scholarlycommons.law.cwsl.edu/cgi/viewcontent.cgi?article=1166&context=cwlr (last visited July 20, 2020)); *see also* 136 CONG. REC. 17,369 (1990) (statement of Sen. Tom Harkin) (discussing how facilities have failed to comply with the ADA by not removing barriers that impede access).

inability to choose."[17] "However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[18]

26.     Thirty years "after the passage of the ADA, numerous facilities are still not compliant leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[19] and private individuals[20] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[21]

27.     Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[22] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[23]

---

[17]     Kelly Johnson *supra* note 15, at 684 (*citing* Elizabeth Keadle Markey, Note, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 FORDHAM L. REV. 185 (2002), available at https://ir.lawnet.fordham.edu/flr/vol71/iss1/4 (last visited July 20, 2020) (arguing for a more lenient standard for standing under the ADA)).

[18]     Kelly Johnson *supra* note 15, at 684 (*citing* Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. REV. 1, 3 (2006), available at https://www.uclalawreview.org/the-perversity-of-limited-civil-rights-remedies-the-case-of-abusive-ada-litigation/ (last visited July 20, 2020) (discussing the need for private enforcement in Title III of the ADA and the fact that the limitations courts are placing on ADA plaintiffs are causing abusive litigation)).

[19]     42 U.S.C. § 12188(b).

[20]     42 U.S.C. § 12188(a).

[21]     Kelly Johnson *supra* note 15, at 684.

[22]     *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).

[23]     *Id.* (*quoting Molski v. Evergreen Dynasty Corp*., 500 F.3d 1047, 1062 (9th Cir. 2007); *D'Lil v. Best Western Encina Lodge & Suite*s, 538 F.3d 1031, 1040 (9th Cir. 2008) (same).

28.     DOJ supports this dynamic, recognizing that because it "cannot investigate every place of public accommodation" for ADA compliance, "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[24]

29.     So have the courts:

[Defendant] also points to the number of cases filed by the same plaintiff in this jurisdiction. Counsel have filed nine cases in this jurisdiction on behalf of [the plaintiff]. I am not impressed by this argument. If the ADA were enforced directly by the government, as are, for example, the fair housing laws, it is likely that government lawyers would have reached out to disabled individuals — "testers" as they are called — to find out which businesses were complying and which were not. [The named plaintiff] has functioned here as a "tester," which is entirely appropriate.[25]

30.     Consistent with the policies summarized above, Plaintiffs now assume the role of private attorney general to ensure they and consumers like them may access Defendant's digital services fully and equally.

## SUBSTANTIVE ALLEGATIONS

31.     The internet is a significant source of information, services, and transactions with instant and 24/7 availability and without the need to travel to attain them.

32.     People who are blind access the internet and mobile applications from smartphones and/or personal computers by using keyboard controls and screen access software, which vocalizes information presented visually on a computer screen or displays that information on a user-

---

[24]     Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, Case No. 1:09-cv-03157 (D. Md.), ECF No. 38, at 1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

[25]     *Norkunas v. HPT Cambridge, LLC*, 969 F. Supp. 2d 184, 194 (D. Mass. 2013) (*quoting Iverson v. Braintree Prop. Assocs., L.P.*, No. 04cv12079-NG, 2008 WL 552652, at *3 n.5 (D. Mass. Feb. 26, 2008).

provided refreshable braille display. Such software provides the only method by which blind persons can independently access the internet and associated computer programs. When websites and applications are not designed to allow for use with screen access software, blind persons are unable to access the information, products, and services offered through the internet.

33.     Screen access technology has existed for decades[26] and widely-accepted standards exist to guide entities in making their websites and apps accessible to screen access software, including legal standards under Section 508 of the Rehabilitation Act. The U.S. Department of Health & Human Services even maintains Best Practices for Accessible Content to ensure that accessibility is "considered throughout the [website] development process."[27]

<strong>Defendant's Inaccessible Website</strong>

34.     Defendant owns, operates, developed, procured, maintains and/or uses the Website for the purpose of providing consumers with information, services, and products through computers, smartphones, and other mobile devices.

35.     Defendant is required to ensure that its Website and electronic communications are accessible to people with disabilities. Despite this obligation, Defendant has denied and continues to deny individuals who are blind meaningful access to the information, services, products, and other information it offers through the Website.

---

[26]     Annemarie Cooke, American Foundation for the Blind, *A History of Accessibility at IBM* (Mar. 2004), available at https://www.afb.org/aw/5/2/14760 (last visited July 20, 2020) (Jim Thatcher created the first screen reader at IBM in 1986.)

[27]     *See* U.S. Department of Health & Human Services, usability.gov, Accessibility Basics, available at https://www.usability.gov/what-and-why/accessibility.html (last visited July 20, 2020).

36.     Specifically, Plaintiffs attempted to access Defendant's Website using JAWS 2020 from Freedom Scientific (i.e. on their desktop computers) and VoiceOver with iOS (*i.e.* on their Apple iPhones).

37.     "JAWS, Job Access With Speech, is the world's most popular screen reader, developed for computer users whose vision loss prevents them from seeing screen content or navigating with a mouse. JAWS provides speech and Braille output for the most popular computer applications on your PC. You will be able to navigate the Internet, write a document, read an email and create presentations from your office, remote desktop, or from home."[28]

38.     "VoiceOver is a gesture-based screen reader that lets you enjoy using iPhone even if you don't see the screen. With VoiceOver enabled, just triple-click the Home button (or the side button on iPhone X or later) to access it wherever you are in iOS. Hear a description of everything happening on your screen, from battery level to who's calling to which app your finger is on. You can also adjust the speaking rate and pitch to suit you. …You can control VoiceOver using a simple set of gestures. Touch or drag your finger around the screen and VoiceOver tells you what's there. Tap a button to hear a description, then double-tap to select. Or flick left and right to move from one element to the next. When



you interact with an element, a black rectangle appears around it so sighted users can follow along. When you prefer privacy, you can activate a screen curtain to turn off the display completely, but

---

[28]     Freedom Scientific, JAWS®, available at https://www.freedomscientific.com/products/software/jaws/ (last visited July 20, 2020).

still hear all that VoiceOver has to say. And now with iOS 13, you can choose from a wide range

of gestures and assign those you're most comfortable with to the commands you use most."[29]

39.     Plaintiffs' counsel also coordinated a review of Defendant's Website with

TalkBack. "TalkBack is the Google screen reader included on Android devices. Talkback gives

you spoken feedback so that you can use your device without looking at your screen."[30]

40.     Here is an
example of another online
store's use of alternative
text to describe its products
to screen reader users.[31]
The image on the left
illustrates what shoppers
perceive visually when
browsing the online store with an iPhone. To the right, is an image from the online store with the



alternative text highlighted for that image in green. Although invisible to the eye, screen reader

software reads this highlighted text aloud in order to describe the image to shoppers who cannot

perceive content visually. In this example, when shoppers tab to the image file with a screen reader,

the online store announces, "One burlap and cotton tote bag with a custom printed architectural

---

[29]     *See* Apple, Accessibility, https://www.apple.com/accessibility/iphone/vision/ (last visited July 20, 2020).

[30]     *See* Google, Android Accessibility Help: TalkBack: Get Started on Android with TalkBack, https://support.google.com/accessibility/android/answer/6283677?hl=en (last visited July 20, 2020).

[31]     *See* Custom Ink, Homepage, https://www.customink.com/ (last visited Mar. 28, 2019).

company logo." Blind shoppers require descriptive alternative text like this to access digital content fully, equally, and independently.

41.    Unfortunately, because of Defendant's failure to build its Website in a manner that is compatible with screen access software, including JAWS and VoiceOver, Plaintiffs are unable to understand, and thus are denied the benefit of, much of the content and services they wish to access.

42.    As a result of visiting the Website, and from investigations performed on their behalf, Plaintiffs found that the Website denies them full and equal access to the goods and services that Defendant offers. For example:

**VoiceOver on iPhone**



(a)    The Website prevents VoiceOver users from accessing some primary content. For example, when consumers visit the Website, Defendant displays a pop-up window advising them of various COVID-19 related business interruptions, like store closings and shipping delays. Consumers who perceive content visually can click "click here" to review additional information or "CONTINUE" to close the pop-up window. Unfortunately, Defendant does not alert VoiceOver users to this pop-up window. Instead, VoiceOver remains focused on the content of the Website's underlying page, making the pop-up invisible to VoiceOver users. As a result, Plaintiffs and Class Members are unlikely (or unable) to perceive this important information.

(b)     Defendant uses visual cues as the only means of conveying information, indicating an action, prompting a response, or distinguishing a visual element. Providing information conveyed visually through an audio means is necessary to ensure that consumers who cannot see can still perceive this information. For example, the Website prompts shoppers to select the collar size and sleeve length they require. After a shopper selects the appropriate collar size, Defendant places a green dotted circle around the matching sleeve length.



Shoppers who do not know their measurements but who perceive content visually will see this visual cue and can select the sleeve length that Defendant believes is most likely to fit. Unfortunately, Defendant fails to include alternative text to also identify the matching sleeve length, making it more difficult for Plaintiffs and Class Members to purchase apparel that will fit while using VoiceOver.

(c)     Defendant fails to provide informative error messages and a means of navigating to them when consumers are required to fix a form submission. It is inevitable that, on occasion, VoiceOver users will be unsuccessful in submitting information into an online form and completing a required prompt. In these cases, screen reader users should be redirected to the page they were on prior to the error or to the error itself. For example, consumers who perceive content visually will see red error indicators on the Website when, for example, they



fail to identify their inside leg length. These consumers can scroll up the page to provide the missing information indicated in red. Unfortunately, Defendant fails to similarly redirect VoiceOver users to the error indicators when appropriate. As a result, Plaintiffs and Class Members are unlikely (or unable) to resolve errors and complete a purchase successfully.

**TalkBack on Android**

(d)     Links and buttons on the Website do not describe their purpose. As a result, consumers who have a visual impairment cannot determine whether they want to follow a particular link, making navigation an exercise of trial and error. For example, consumers who perceive content visually will likely recognize the Website's magnifying glass icon and understand that by clicking it, Defendant will redirect them to its online search service. Unfortunately, this icon is not labeled with sufficiently descriptive alternative text. As a result, when TalkBack users hover over it, they hear "home [inaudible] ct shirts," then a long string of numbers and letters. Because this



alternative text is meaningless, Plaintiffs and Class Members are unlikely (or unable) to locate and take advantage of this important search feature.

(e)     The Website does not provide a sufficient text equivalent for many important non-text elements. Providing text alternatives allows information to be rendered in a variety of ways by a variety of consumers. A person who cannot see a picture, logo, or icon can have a text alternative read aloud using synthesized speech. For example, consumers who perceive content visually will see two buttons on the Website denoting the type of cuff they can purchase: Button Cuff or French Cuff. These shoppers must answer the prompt by selecting the button associated with their preferred cuff style. Unfortunately, the alternative text associated with each button provides: "cuff type toggle button not selected double tap to activate." This alternative text is insufficient because it does not describe the cuff type or how one button is different from the other. As a result, Plaintiffs and Class Members are unable to complete this prompt independently.



(f)      The Website includes content subject to
time limits that prevent users with disabilities from reading and
understanding the content, reacting or responding to certain
prompts, or understanding screen layouts and controls.
Consumers who perceive content visually will notice a pop-up
window after placing an item in their shopping bag.
Unfortunately, Defendant fails to notify TalkBack users of this
pop-up window, making it impossible for them to access it before
it disappears. Because they cannot access this "shortcut" to the
online payment platform, Plaintiffs and Class Members must tab
back to the top of a webpage in order to complete a purchase. This

burdensome, backward, and confusing interaction makes it more likely that Plaintiffs and Class
Members will abandon the items in their shopping bag and leave the Website before completing a
purchase.

**JAWS on Desktop**

(g)      Defendant
prevents JAWS users from
accessing some primary content.
For example, the Website
displays various menu options at
the top of its homepage that

shoppers may click to view different sections of the website, like Sales, Shirts, and Suits & Blazers.
Defendant redirects shoppers to the corresponding area of its store after they click one of these

buttons. Unfortunately, Defendant does not alert JAWS users of the dropdown menu that appears when they click the "More" menu option. As a result, Plaintiffs and Class Members cannot use this shortcut to visit the many other areas of Defendant's store that are consolidated in the "More" menu option, like Face Masks, Belts, and Cufflinks. This access barrier limits Plaintiffs and Class Members' access to a fraction of Defendant's online store.

**Plaintiffs' Injuries**

43.     The access barriers described above, and others, deny Plaintiffs full and equal access to the services Defendant offers on its Website, and now deter Plaintiffs from attempting to use the Website.[32]

44.     Still, Plaintiffs intend to attempt to access the Website within the next six months to research the goods and services Defendant offers or to test the Website for compliance with the ADA.[33]

45.     If the Website were accessible (*i.e.* if Defendant removed the access barriers and implemented the practices described herein), Plaintiffs could independently access Defendant's online services.

**Defendant's Website Must Comply with the ADA**

46.     The ADA "as a whole is intended 'to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'"[34]

47.     Title III advances that goal by providing that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities,

---

[32]     *Your Website is Scaring Customers Away. 5 Easy Ways to Fix It*, *supra* note 13.

[33]     *See Norkunas* and *Iverson supra* note 28.

[34]     *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 589 (1999) (*quoting* 42 U.S.C. § 12101(b)(1)).

privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."[35]

48.     DOJ regulations require that a public accommodation "furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities."[36]

49.     DOJ defines "auxiliary aids and services" to include "accessible electronic and information technology" or "other effective methods of making visually delivered materials available to individuals who are blind or have low vision."[37]

50.     Therefore, the ADA mandates that places of public accommodation provide auxiliary aids and services to make visual materials available to individuals who are blind.[38]

51.     Defendant is a place of public accommodation under the ADA because it is a "clothing store…or other sales or rental establishment."[39]

52.     The Website is a service, facility, advantage, or accommodation of Defendant.

53.     As a service, facility, advantage, or accommodation of Defendant, Defendant must ensure blind patrons have full and equal access to the Website's goods, content, and services.

54.     Indeed, the ADA expressly provides that a place of public accommodation engages in unlawful discrimination if it fails to "take such steps as may be necessary to ensure that no

---

[35]     42 U.S.C. § 12182(a).

[36]     28 C.F.R. § 36.303(c)(1); *see Bragdon v. Abbott*, 524 U.S. 624, 646 (1998) (holding that DOJ's administrative guidance on ADA compliance is entitled to deference).

[37]     28 C.F.R. § 36.303(b)(2).

[38]     28 C.F.R. § 36.303.

[39]     42 U.S.C. § 12181(7)(E).

individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services."[40]

## Defendant Received Fair Notice of its ADA Obligations

55.     Defendant and other covered entities have had more than adequate notice of their obligation to offer individuals with disabilities an equal opportunity to access and enjoy their services and communications, including the Website.

56.     Since its enactment in 1990, the ADA has clearly stated that covered entities must provide "full and equal enjoyment of the[ir] goods, services, facilities, privileges, advantages, or accommodations" to people with disabilities,[41] and must "ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services."[42]

57.     The United States Department of Justice ("DOJ") first announced its position that Title III applies to websites of public accommodations in a 1996 letter from Assistant Attorney General Deval Patrick responding to an inquiry by Senator Tom Harkin regarding the accessibility of websites to blind individuals.[43]

58.     Since then, DOJ has "repeatedly affirmed the application of [T]itle III to Web sites of public accommodations."[44]

---

[40]     42 U.S.C. § 12182(b)(2)(A)(iii).

[41]     42 U.S.C. § 12182(a).

[42]     42 U.S.C. § 12182(b)(2)(A)(iii).

[43]     Letter from Deval L. Patrick, Assistant Attorney General, Civil Rights Division, Department of Justice, to Tom Harkin, U.S. Senator (Sept. 9, 1996), available at w https://www.justice.gov/crt/foia/file/666366/download (last visited July 20, 2020)

[44]     75 Fed. Reg. 43460-01, 43464 (July 26, 2010).

59.    In 2000, DOJ argued to the Fifth Circuit that a business providing services solely over the internet is subject to the ADA's prohibitions on discrimination on the basis of disability.[45]

60.    In 2002, DOJ argued to the Eleventh Circuit that there need not be a nexus between a challenged activity and a private entity´s "brick-and-mortar" facility to obtain coverage under Title III. DOJ argued that Title III applies to any activity or service offered by a public accommodation, on or off the premises.[46]

61.    In 2014, DOJ entered into a settlement agreement with America's then-leading internet grocer to remedy allegations that its website, www.peapod.com, is inaccessible to some individuals with disabilities, in violation of the ADA. DOJ's enforcement action against this online-only business affirms the ADA covers public accommodations that do not operate brick-and-mortar facilities open to the public.[47]

62.    In a September 25, 2018 letter to U.S. House of Representative Ted Budd, U.S. Department of Justice Assistant Attorney General Stephen E. Boyd confirmed that public accommodations must make the websites they own, operate, or control equally accessible to individuals with disabilities. Assistant Attorney General Boyd's letter provides:

---

[45]    Brief of the United States as Amicus Curiae in Support of Appellant, *Hooks v. Okbridge, Inc.*, Case No. 99-50891 (5th Cir. July 20, 2000), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/hooks.pdf (last visited July 20, 2020) ("A COMMERCIAL BUSINESS PROVIDING SERVICES SOLELY OVER THE INTERNET IS SUBJECT TO THE ADA'S PROHIBITION AGAINST DISCRIMINATION ON THE BASIS OF DISABILITY.") (emphasis in original).

[46]    Brief for the United States as Amicus Curiae in Support of Appellant, *Rendon v. Valleycrest Productions, Inc.*, Case No. 01-11197, 294 F.3d 1279 (11th Cir. 2002), available at https://www.justice.gov/sites/default/files/crt/legacy/2010/12/14/rendon.pdf (last visited July 20, 2020).

[47]    *See* Settlement Agreement Between the United States of America and Ahold U.S.A., Inc. and Peapod, LLC, DJ 202-63-169 (Nov. 17, 2014), available at https://www.justice.gov/file/163956/download (last visited July 20, 2020).

The Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago. This interpretation is consistent with the ADA's title III requirement that the goods, services, privileges, or activities provided by places of public accommodation be equally accessible to people with disabilities.[48]

63.    In 2019, the United States Supreme Court declined to review a Ninth Circuit decision holding that (1) Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("Title III") covers websites and mobile applications and (2) the imposition of liability on businesses for not having an accessible website and mobile application does not violate the due process rights of public accommodations.[49]

64.    Thus, since at least since 1996, Defendant has been on notice that its online offerings must effectively communicate with all American consumers and facilitate "full and equal enjoyment" of the goods and services it offers.[50]

## CLASS ALLEGATIONS

65.    Plaintiffs bring this class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2) on behalf of themselves and the following nationwide class: all blind or visually disabled individuals who use screen reader auxiliary aids to navigate digital content and who have accessed, attempted to access, or been deterred from attempting to access, or who will access, attempt to access, or be deterred from accessing the Website from the United States.

---

[48]    *See* Letter from Assistant Attorney General Stephen E. Boyd, U.S. Department of Justice, to Congressman Ted Budd, U.S. House of Representatives (Sept. 25, 2018), https://www.adatitleiii.com/wp-content/uploads/sites/121/2018/10/DOJ-letter-to-congress.pdf (last visited July 20, 2020).

[49]    *See Robles v. Domino's Pizza, LLC*, 913 F.3d 898 (9th Cir. 2019) cert. denied 589 U.S. ___ (U.S. Oct. 7, 2019) (No. 18-1539).

[50]    42 U.S.C. § 12182(a).

66.    <u>Numerosity</u>: The class described above is so numerous that joinder of all individual members in one action would be impracticable. The disposition of the individual claims of the respective class members through this class action will benefit both the parties and this Court, and will facilitate judicial economy.

67.    <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the members of the class. The claims of Plaintiffs and members of the class are based on the same legal theories and arise from the same unlawful conduct.

68.    <u>Common Questions of Fact and Law</u>: There is a well-defined community of interest and common questions of fact and law affecting members of the class in that they all have been, are being, and/or will be denied their civil rights to full and equal access, and use and enjoyment of Defendant's Website and/or services due to Defendant's failure to make the Website full accessible and independently usable as described herein.

69.    <u>Adequacy of Representation</u>: Plaintiffs are adequate representatives of the class because their interests do not conflict with the interests of the members of the class. Plaintiffs will fairly, adequately, and vigorously represent and protect the interests of the members of the class, and they have no interests antagonistic to the members of the class. Plaintiffs have retained counsel who are competent and experienced in the prosecution of class action litigation, generally, and who possess specific expertise in the context of ADA litigation.

70.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) because Defendant has acted or refused to act on grounds generally applicable to the class, making appropriate both declaratory and injunctive relief with respect to Plaintiffs and the class as a whole.

## SUBSTANTIVE VIOLATION

### Title III of the ADA, 42 U.S.C. § 12181 *et seq.*

71.     The assertions contained in the previous paragraphs are incorporated by reference.

72.     Title III of the ADA guarantees that individuals with disabilities shall have full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation.[51]

73.     Defendant is bound by the regulations implementing Title III of the ADA, which require that places of public accommodation ensure effective communication to individuals with disabilities.[52]

74.     Plaintiffs are legally blind and therefore they are individuals with a disability under the ADA.

75.     Defendant is a place of public accommodation under the ADA because it is a "clothing store…or other sales or rental establishment."[53]

76.     Defendant owns, operates, or maintains the Website.

77.     The Website is a service, facility, privilege, advantage, or accommodation of Defendant.

78.     The Website contains barriers that prevent full and equal use by blind persons, including Plaintiffs, using screen access software.

---

[51]     42 U.S.C. § 12182; 28 C.F.R. § 36.201.

[52]     28 C.F.R.§ 36.303(c).

[53]     42 U.S.C. § 12181(7)(E).

79.     Because of these barriers, Defendant denies Plaintiffs full and equal enjoyment of the information, goods, services, facilities, privileges, advantages, or accommodations that it makes available to the sighted public through the Website.

80.     These access barriers now deter Plaintiffs from attempting to use the Website.

81.     Defendant's discrimination is ongoing.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the members of the class, request judgment as follows:

(A)     A Declaratory Judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took no action that was reasonably calculated to ensure the Website is fully accessible to, and independently usable by, individuals with visual disabilities;

(B)     A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendant to take all steps necessary to bring the Website into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that the Website is fully accessible to, and independently usable by, blind individuals, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following an institutional policy that will in fact cause it to remain fully in compliance with the law.

(C)     Payment of nominal and other damages, as the Court deems proper;

(D)     Payment of costs of suit;

(E)     Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR

§ 36.505, including costs of monitoring Defendant's compliance with the judgment;[54]

(F)     Whatever other relief the Court deems just, equitable and appropriate; and

(G)     An Order retaining jurisdiction over this case until Defendant has complied with

the Court's Orders.

Dated: July 20, 2020                              */s/ Kevin W. Tucker*

Kevin W. Tucker (He/Him/His)
Pa. No. 312144
Kevin J. Abramowicz
Pa. No. 320659
EAST END TRIAL GROUP LLC
186 42nd St., P.O. Box 40127
Pittsburgh, PA 15201
Tel. (412) 877-5220
ktucker@eastendtrialgroup.com
kabramowicz@eastendtrialgroup.com

Lawrence H. Fisher
Pa. Bar ID #67667
One Oxford Centre
301 Grant Street, Suite 4300
Pittsburgh, PA 15219
Tel. (412) 577-4040
lawfirst@lawrencefisher.com

*Counsel for Plaintiffs*

---

[54]     *See People Against Police Violence v. City of Pittsburgh*, 520 F.3d 226, 235 (3d Cir. 2008) ("This Court, like other Courts of Appeals, allows fees to be awarded for monitoring and enforcing Court orders and judgments."); *Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, Case No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191); *Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11); Amended Order Granting In Part Plaintiffs' Motion For Attorneys' Fees And Costs; Denying Administrative Motion To Seal, *National Federation of the Blind of California v. Uber Technologies, Inc.*, Case No 14-cv-04086-NC (N.D. Cal. Nov. 8, 2019), https://rbgg.com/wp-content/uploads/NFB-v-Uber-Amended-Order-Granting-In-Part-Pltfs-Motion-for-Attys-Fees-and-Costs-11-08-19.pdf (last accessed July 20, 2020) (finding plaintiffs "are entitled to reasonable attorneys' fees incurred in connection with monitoring [defendant's] compliance with the Settlement" of a Title III ADA case).